UNITED STATES DISTRICT COURT
EASTERN  DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Raymond J. Carey,

       Plaintiff,

vs.

Foley & Lardner LLP,

       Defendant.

Hon.  John Corbett O'Meara

Case No. 5:11-cv-10818-JCO-MJH

---

**GASIOREK, MORGAN, GRECO
 & McCAULEY, P.C.**
By:  Sam Morgan (P-36694)
    Donald J. Gasiorek (P-24987)
Attorneys for Plaintiff
30500 Northwestern Highway, Suite 425
Farmington Hills, Michigan 48334
(T) (248) 865-0001 / (F) (248) 865-0002
smorgan@gmgmlaw.com
dgasiorek@gmgmlaw.com

**RAYMOND J. CAREY P33266**
Co-counsel for Plaintiff
460 Lakeland
Grosse Pointe, Mi 48230
(T) (313) 580.1884
rjcarey@foley.com
marcar54@comcast.net

**LITTLER MENDELSON PLC**
By:  Charles C. DeWitt, Jr.(P-26636)
Attorneys for Defendant
200 Renaissance Center
Suite 3110
Detroit, Michigan 48243
(T) (313) 446-6401/ (F) (313) 446-6405
cdewitt@littler.com

---

### FIRST AMENDED COMPLAINT

The Plaintiff, Raymond J. Carey ("Plaintiff"), by and through his attorneys, GASIOREK,

MORGAN, GRECO & McCAULEY, P.C., complains against Defendant, Foley & Lardner, LLP

("Defendant"), as follows:

## NATURE OF CASE

1.      This is an action for discrimination on account of gender, race and age in violation of federal statutory enactments, including the: Equal Pay Act ("EPA"), 29 U.S.C.§206(d);  Title VII of the Civil Rights Act of 1964, as amended, 42. U.S.C.§§2000e, *et seq.* ( "Title VII");  the Civil Rights Act of 1991, 42 U.S.C. § 1981a ("CRA"); and, the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, *et seq.* ("ADEA").

## PARTIES

2.      Plaintiff is a Caucasian, male individual, born on October 13, 1953, who is 57 years of age and resides in the City of Grosse Pointe, Michigan, in the County of Wayne, within the State of Michigan.

3.      Defendant is a Wisconsin Limited Liability Partnership engaged in the practice of law with its office headquarters in Milwaukee, Wisconsin, but it transacts business and has offices throughout the United States, including Detroit, in the County of Wayne, State of Michigan.

4.      The amount in controversy between the parties exceeds $75,000, exclusive of interest and costs.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction under 28 U.S.C. §§1331, 1337, 1343, and 1346 and 42 U.S. C. § 2000e-5(f) because this action poses federal questions involving continuing violations of the EPA, Title VII, the CRA and the ADEA, and because a right to sue notice was issued by the Equal Employment Opportunity Commission ("EEOC") on May 26, 2011, based on a charge filed by Plaintiff with the EEOC on December 22, 2010.

6.      The Court also has personal jurisdiction over Defendant because Defendant transacts business in Michigan and within this District, Plaintiff is employed by Defendant in

Michigan and within this District, and the acts of discrimination about which Plaintiff complains occurred in and caused injury to Plaintiff in Michigan and within this District and arise out of Plaintiff's employment with Defendant and Defendant's transaction of business in Michigan and within this District.

7.     Venue is proper in this Court under 28 U.S.C.§1391 and 42 U.S.C. §2000e-5(f)(3) because Plaintiff is a resident of Grosse Pointe, Michigan, in the County of Wayne, within the State of Michigan, which is within this District, Defendant transacts business in Michigan and within this District, Plaintiff is employed by Defendant in Michigan and within this District, and the acts of discrimination about which Plaintiff complains occurred in and caused injury to Plaintiff in Michigan and within this District and arise out of Plaintiff's employment with Defendant and Defendant's transaction of business in Michigan and within this District.

**GENERAL ALLEGATIONS**

A.     **Plaintiff's Background, Qualifications, Skills and Experience**

8.     Plaintiff graduated from a national law school in 1981, passed the Michigan Bar Exam and was admitted to the State Bar of Michigan in 1981, became licensed to practice law in federal and state courts in Michigan in 1981, and has been admitted to the practice of law in various federal circuit courts of appeal and federal district courts throughout the United States since 1981.

9.     Plaintiff has been a member of the American Bar Association, Michigan Bar, Federal Bar Association, and the Detroit Metropolitan Bar Association along with the labor and employment, litigation and other committees of these organizations since 1981.

10.     During the period between 1981 and October, 2000, Plaintiff was employed in succession at three different preeminent law firms each with offices in Detroit, Michigan, established himself as an accomplished attorney, trial lawyer and negotiator within each of these

3

firms with an expertise in labor and employment law, among other legal disciplines, was a shareholder or partner of each of these law firms, and provided legal representation as a member of each firm to major corporations in Michigan and around the country.

11.   During the period between 1981 and October, 2000, Plaintiff served as a trustee, board member, officer, President or Chair of the boards, and in other volunteer capacities for various professional, community and other organizations in Michigan and elsewhere, including, but not limited to, the Detroit Barristers Association.

12.   Plaintiff remains an accomplished attorney, trial lawyer and negotiator with an expertise in labor and employment law, among other legal disciplines, who continues to provide legal representation to major corporations in Michigan and around the country, and continues to serve as a trustee, board member, officer, and in other volunteer capacities for various professional, community and other organizations in Michigan and elsewhere.

13.   Plaintiff is a former board member, officer and President of the Detroit Metropolitan Bar Association and currently is a Trustee of the Detroit Metropolitan Bar Association Foundation.

### B.   Defendant

14.   Although Defendant at one time was organized as a general partnership and today is organized as a limited liability partnership, it has not functioned as a partnership since at least October, 2000, with respect to the terms and conditions of employment applicable to attorneys who are designated partners of the firm. Instead, Defendant has functioned as an employer of Defendant, and each partner has been treated as an employee of Defendant.

15.   Since at least October, 2000, the business, financial and human resource functions and compensation practices of the Defendant firm, among other functions, have been controlled

by a Management Committee, the members of which have not been selected by the partners of the firm, but instead have been appointed by its own members.

16.     Since at least October, 2000, those designated as partners of Defendant firm have not been elected to partnership by other partners, but instead have been appointed by the Management Committee.

17.     Since at least October, 2000, those designated as partners of Defendant have been subject to terms and conditions of employment established exclusively by Defendant's Management Committee, its CEO and/or its COO and encompassed by employment policies, practices and procedures established by the Management Committee which also have been generally applicable to all other employees of Defendant.

18.     Since at least October, 2000, those designated as partners of Defendant did not receive annual profit distributions nor were they compensated on an equal, proportional or other reasonably established basis based on the profitability of Defendant firm or other objective factors, but instead the Management Committee determined on a subjective basis in late February or March of each year each partner's annual salary for each completed fiscal year of the firm, which has been January 31, and each partner's monthly salary or draw against annual salary for the succeeding fiscal year.

19.     Members of Defendant's Management Committee have admitted in written communications to Plaintiff and other partners of Defendant that Defendant is an employer and partners of Defendant are employees of Defendant.

20.     Members of Defendant's Management Committee have admitted to Plaintiff and other partners of Defendant that compensation determinations for partners of Defendant have

been subjective in nature and not based on a seniority, merit system, quality of work, or other objective standard(s) since at least October, 2000.

### C.   Defendant's Solicitation of Plaintiff

21.   Defendant historically provided a broad range of legal services primarily to corporate and other business clients from Defendant's offices in Wisconsin.

22.   Upon information and belief, sometime during the 1990s, Defendant embarked on a strategy that was intended to establish itself as a national law firm recognized by current and prospective corporate and other business clients which did business around the country and even globally as equally or better qualified than other national law firms to provide legal services to them around the country and even globally.

23.   Upon information and belief, Defendant had established offices in California, Florida, Colorado, Illinois, Washington, D.C., and in at least one foreign location in accordance with this strategy as of October, 2000, while continuing to seek opportunities to establish other offices elsewhere.

24.   Upon information and belief, Defendant decided sometime during 2000 in accordance with this strategy to establish an office in Detroit, Michigan, and to recruit accomplished attorneys to become partners of Defendant and founding members of what became Defendant's Detroit, Michigan office.

25.   During the period between the summer and October, 2000, a representative of Defendant who was a member of and authorized by Defendant's Management Committee solicited accomplished attorneys with diverse legal practices from within the Detroit Metropolitan community to accept employment with Defendant as founding members of what

became Defendant's first and only Michigan office, which was to be located in Detroit, Michigan.

26. Defendant's representative was authorized by Defendant's Management Committee at all times applicable to formation of Defendant's Detroit office to negotiate terms and conditions to govern the employment of and compensation and benefits to be tendered to the attorneys solicited by him.

27. Defendant's representative solicited at least six attorneys with diverse legal practices from within the Detroit Metropolitan community to become partners of Defendant and along with two then current partners of Defendant relocating from other offices of Defendant to become the eight founding members of what became Defendant's Detroit office.

28. Defendant's authorized representative solicited Plaintiff to terminate his employment and status as an equity partner with the Detroit law firm with which he was affiliated at the time to become a partner of Defendant and one of the eight founding members of what became Defendant's Detroit office.

29. Plaintiff had a very positive professional relationship with and was not seeking to terminate his employment and equity partner relationship with the law firm with which he was affiliated at the time and had not previously contacted Defendant or any of its representatives.

30. During the period between the summer and October, 2000, Defendant's representative either during meetings with Plaintiff or during telephone conference calls with Plaintiff made numerous promises and representations to Plaintiff upon which Plaintiff relied, which Plaintiff later learned either were false or Defendant had no intention of honoring, to induce Plaintiff to terminate his employment and equity partnership with the Detroit law firm

7

with which he was affiliated at the time to become an employee with partner status of Defendant and one of the founding members of Defendant's Detroit office.

31.     Among the promises and representations made by Defendant's representative to Plaintiff to induce Plaintiff to accept employment with Defendant and upon which Plaintiff relied, which Plaintiff later learned were false or not to be honored, he promised that Plaintiff would be employed and appointed as a full partner of Defendant upon commencement of employment with Defendant; that Plaintiff would not at any time after acceptance of employment be paid less than guaranteed, minimum monthly and annual compensation to which Plaintiff and Defendant would mutually agree; that Plaintiff's monthly and annual compensation would be based upon and would annually increase based on Plaintiff's productivity; that Plaintiff's productivity would be measured by hours recorded by Plaintiff and billed by Defendant to clients for professional services provided by Plaintiff to the clients as a member of Defendant firm and annual revenue realized by Defendant from client payment of fees charged by Defendant for professional services provided by Plaintiff and/or for which Plaintiff was entitled to billing and/or supervisory credit; that Plaintiff would receive full billing credit for all clients and client matters procured by him and full supervisory credit for all client matters for which he provided legal representation whether or not he procured the client or client matter; that neither Defendant nor partners of Defendant would interfere with extant or prospective client relationships procured by Plaintiff; that in all other respects Plaintiff would be treated the same as other founding partners of the Detroit office and other partners of Defendant relative to compensation, benefits and all other terms and conditions of employment, including but not limited to, billing and supervisory credit for clients and client matters procured by Plaintiff as a member of the Defendant law firm;  that in all other respects Plaintiff would be treated without

regard to his or others' gender, race or age relative to compensation, benefits and all other terms and conditions of employment, including but not limited to, billing and supervisory credit for clients and client matters procured by Plaintiff as a member of the Defendant law firm; and that Plaintiff's annual compensation would be the greater of 60% of amounts annually billed by Defendant for professional services provided by Plaintiff or a reasonable, equitably fair higher percentage of annual revenue realized by Defendant due to Plaintiff's productivity and from client payment of fees charged by Defendant for professional services provided by Plaintiff and/or for which Plaintiff was entitled to billing and/or supervisory credit, which Defendant was able to set and collect at substantially higher hourly rates than that charged for most other similarly situated Detroit and other partners of Defendant because of Plaintiff's expertise and experience and relationships he maintained with clients that he procured.

32.    During the various discussions that occurred between Plaintiff and Defendant's representative between the summer and October, 2000, Plaintiff requested that Defendant provide Plaintiff with copies of various documents, including but not limited to, the Partnership Agreement and retirement and other benefit plans applicable to partners of Defendant's law firm, for his review and consideration while deliberating over prospects for employment with Defendant.

33.    Although Defendant's representative extended various offers to Plaintiff between late summer and October, 2000, pertaining to guaranteed, minimum monthly and annual compensation that would be paid by Defendant to Plaintiff should Plaintiff agree to accept employment with Defendant, he never provided Plaintiff with the documents that Plaintiff had requested.

34.    In late September or early October, 2000, Defendant's representative extended an oral offer to Plaintiff providing for guaranteed, minimum monthly and annual salary to be paid to Plaintiff were he to accept employment with Defendant, but also specifying that Plaintiff would initially be employed as what was termed a *contract* partner for the approximately 3 month period between October, 2000, and February 1,2001, a condition which had never before been discussed with Plaintiff and which Plaintiff advised he was unwilling to accept.

35.    Defendant's representative also promised Plaintiff that he would unconditionally become a full partner of Defendant on February 1, 2001, and that at all times before and after February 1, 2001, he would not be paid less than guaranteed, minimum monthly and annual compensation to which Plaintiff and Defendant would mutually agree; that Plaintiff's monthly and annual compensation would be based upon and would annually increase based on Plaintiff's productivity; that Plaintiff's productivity would be measured by hours recorded by Plaintiff and billed by Defendant to clients for professional services provided by Plaintiff to the clients as a member of Defendant firm and annual revenue realized by Defendant from client payment of fees charged by Defendant for professional services provided by Plaintiff and/or for which Plaintiff was entitled to billing and/or supervisory credit; that Plaintiff would receive full billing credit for all clients and client matters procured by him and full supervisory credit for all client matters for which he provided legal representation whether or not he procured the client or client matter; that neither Defendant nor partners of Defendant would interfere with then extant and prospective client relationships procured by Plaintiff; that in all other respects Plaintiff would be treated the same as other founding partners of the Detroit office and other partners of Defendant relative to compensation, benefits and all other terms and conditions of employment, including but not limited to, billing and supervisory credit for clients and client matters procured by

Plaintiff as a member of the Defendant law firm;  that in all other respects Plaintiff would be treated without regard to his or others' gender, race or age relative to compensation, benefits and all other terms and conditions of employment, including but not limited to, billing and supervisory credit for clients and client matters procured by Plaintiff as a member of the Defendant law firm; and that Plaintiff's annual compensation would be the greater of 60% of amounts annually billed by Defendant for professional services provided by Plaintiff or a reasonable, equitably fair higher percentage of annual revenue realized by Defendant due to Plaintiff's productivity and from client payment of fees charged by Defendant for professional services provided by Plaintiff and/or for which Plaintiff was entitled to billing and/or supervisory credit, which Defendant was able to set and collect at substantially higher hourly rates than that charged for most other similarly situated Detroit and other partners of Defendant because of Plaintiff's expertise and experience and relationships he maintained with clients that he procured.

36.     Plaintiff notified Defendant's representative in mid October, 2000, that he had rejected the offer extended by Defendant's representative because of the *contract* partner contingency, because the guaranteed, minimum monthly and annual compensation offered by Defendant was inadequate. and because he had not provided Plaintiff with documents that Plaintiff had requested, among other reasons, and Plaintiff intended to maintain his professional relationship with and status as an equity partner with the Detroit law firm with which he was affiliated at the time.

37.     Defendant's representative later contacted Plaintiff and asked Plaintiff to reconsider.  Plaintiff again responded that he would not accept the *contract* partner contingency and that he had rejected the guaranteed, minimum monthly and annual compensation offered by

Defendant as inadequate. However, Plaintiff advised Defendant's representative that he would further deliberate over Defendant's offer and later advise him of any counter proposal.

38.     However, before Plaintiff could reply to Defendant' s representative, Defendant published biographical and other information about Plaintiff and identified Plaintiff as a member of the Defendant law firm on its website at the apparent direction of Defendant's representative, but without Plaintiff's knowledge, authorization or consent.

39.     Plaintiff complained to Defendant's representative about Defendant's unauthorized publication, but it was too late.

40.     The managing partner, management committee members, and Plaintiff's former partners at the Detroit law firm with which Plaintiff's was affiliated at the time saw the information published about Plaintiff on Defendant's website and, in reaction, the managing partner confronted Plaintiff and accused Plaintiff of disloyalty and other misconduct in breach of Plaintiff's obligations to the firm.

41.     Although Plaintiff had not accepted employment with Defendant, had not authorized Defendant's publication of information about him, and had acted at all times in compliance with his professional and other obligations to his former law firm, his professional relationship with the firm was destroyed by Defendant's unauthorized acts.

42.     In response to Plaintiff's complaint to Defendant's representative about Defendant's unauthorized publication, Defendant's representative promised Plaintiff enhanced minimum, guaranteed monthly and annual compensation and reiterated the other promises and representations specified above as consideration were Plaintiff to accept the offer of employment with Defendant.  These included, but were not limited to, that Plaintiff would unconditionally become a full partner on February 1, 2001; that at all times before and after February 1, 2001, he

12

would not be paid less than the guaranteed, minimum monthly and annual compensation to which Plaintiff and Defendant had mutually agreed; that Plaintiff's monthly and annual compensation would be based upon and would annually increase based on Plaintiff's productivity; that Plaintiff's productivity would be measured by hours recorded by Plaintiff and billed by Defendant to clients for professional services provided by Plaintiff to the clients as a member of Defendant firm and annual revenue realized by Defendant from client payment of fees charged by Defendant for professional services provided by Plaintiff and/or for which Plaintiff was entitled to billing and/or supervisory credit; that Plaintiff would receive full billing credit for all clients and client matters procured by him and full supervisory credit for all client matters for which he provided legal representation whether or not he procured the client or client matter; that neither Defendant nor partners of Defendant would interfere with then extant and prospective client relationships procured by Plaintiff; that in all other respects Plaintiff would be treated the same as other founding partners of the Detroit office and other partners of Defendant relative to compensation, benefits and all other terms and conditions of employment, including but not limited to, billing and supervisory credit for clients and client matters procured by Plaintiff as a member of the Defendant law firm; that in all other respects Plaintiff would be treated without regard to his or others' gender, race or age relative to compensation, benefits and all other terms and conditions of employment, including but not limited to, billing and supervisory credit for clients and client matters procured by Plaintiff as a member of the Defendant law firm; and that Plaintiff's annual compensation would be the greater of 60% of amounts annually billed by Defendant for professional services provided by Plaintiff or a reasonable, equitably fair higher percentage of annual revenue realized by Defendant due to Plaintiff's productivity and from client payment of fees charged by Defendant for professional

services provided by Plaintiff and/or for which Plaintiff was entitled to billing and/or supervisory credit, which Defendant was able to set and collect at substantially higher hourly rates than that charged for most other similarly situated Detroit and other partners of Defendant because of Plaintiff's expertise and experience and relationships he maintained with clients that he procured.

43.    As of this time, Defendant had not provided Plaintiff with a proposed written agreement confirming the promises made by Defendant's representative to induce Plaintiff to resign from his former law firm and to accept employment with Defendant or the Partnership Agreement and other documents previously requested by Plaintiff.

44.    Plaintiff had no other employment opportunities or the ability to provide continuing support for his wife and two children at the time. As a consequence, Plaintiff had no option other than to resign as a member and equity partner of his former law firm and to commence employment with Defendant.

45.    Plaintiff began employment with Defendant, effective October 23, 2000, in reliance on the promises and representations communicated by Defendant's representative and because he had no other option other than unemployment and inability to support his wife and two children.

### D. <u>Defendant's Continuing Pattern Of Wrongful And Discriminatory Behavior</u>

46.    Despite the circumstances which necessitated that Plaintiff commence employment with Defendant, Defendant did not honor promises made by its representative to Plaintiff from almost the inception of Plaintiff's employment relationship with Defendant and Defendant demonstrated that the promises made to Plaintiff were false when they were made and that Defendant made them in bad faith with no intention of honoring them.

14

47.      Defendant did not appoint Plaintiff to full partnership status as of February 1, 2001, and thereafter also did not honor promises that he would not be paid less than the guaranteed, minimum monthly and annual compensation to which Plaintiff and Defendant had mutually agreed; that Plaintiff's monthly and annual compensation would be based upon and would annually increase based on Plaintiff's productivity; that Plaintiff's productivity would be measured by hours recorded by Plaintiff and billed by Defendant to clients for professional services provided by Plaintiff to the clients as a member of Defendant firm and annual revenue realized by Defendant from client payment of fees charged by Defendant for professional services provided by Plaintiff and/or for which Plaintiff was entitled to billing and/or supervisory credit; that Plaintiff would receive full billing credit for all clients and client matters procured by him and full supervisory credit for all client matters for which he provided legal representation whether or not he procured the client or client matter; that neither Defendant nor partners of Defendant would interfere with then extant and prospective client relationships procured by Plaintiff; that in all other respects Plaintiff would be treated the same as other founding partners of the Detroit office and other partners of Defendant relative to compensation, benefits and all other terms and conditions of employment, including but not limited to, billing and supervisory credit for clients and client matters procured by Plaintiff as a member of the Defendant law firm; that in all other respects Plaintiff would be treated without regard to his or others' gender, race or age relative to compensation, benefits and all other terms and conditions of employment, including but not limited to, billing and supervisory credit for clients and client matters procured by Plaintiff as a member of the Defendant law firm; and that Plaintiff's annual compensation would be the greater of 60% of amounts annually billed by Defendant for professional services provided by Plaintiff or a reasonable, equitably fair higher percentage of annual revenue realized

by Defendant due to Plaintiff's productivity and from client payment of fees charged by Defendant for professional services provided by Plaintiff and/or for which Plaintiff was entitled to billing and/or supervisory credit, which Defendant was able to set and collect at substantially higher hourly rates than that charged for most other similarly situated Detroit and other partners of Defendant because of Plaintiff's expertise and experience and relationships he maintained with clients that he procured.

48.     Between October and December, 2000, after Plaintiff had already commenced employment with Defendant and in breach of promises made to Plaintiff and upon which he relied, Defendant's representative contacted Plaintiff and gave notice to Plaintiff that Defendant was unilaterally extending the period during which Plaintiff would be employed by Defendant as a *contract* partner for an additional year, i.e. until February 1, 2002.

49.     Defendant's representative promised this time that Plaintiff would unconditionally be appointed and become a full partner as of February 1, 2002, and he reiterated promises that throughout the period between October, 2000, and February 1, 2002, and thereafter, Plaintiff would not be paid less than guaranteed, minimum monthly and annual compensation to which Plaintiff and Defendant had mutually agreed; that Plaintiff's monthly and annual compensation would be based upon and would annually increase based on Plaintiff's productivity; that Plaintiff's productivity would be measured by hours recorded by Plaintiff and billed by Defendant to clients for professional services provided by Plaintiff to the clients as a member of Defendant firm and annual revenue realized by Defendant from client payment of fees charged by Defendant for professional services provided by Plaintiff and/or for which Plaintiff was entitled to billing and/or supervisory credit; that Plaintiff would receive full billing credit for all clients and client matters procured by him and full supervisory credit for all client matters for

16

which he provided legal representation whether or not he procured the client or client matter; that neither Defendant nor partners of Defendant would interfere with then extant and prospective client relationships procured by Plaintiff; that in all other respects Plaintiff would be treated the same as other founding partners of the Detroit office and other partners of Defendant relative to compensation, benefits and all other terms and conditions of employment, including but not limited to, billing and supervisory credit for clients and client matters procured by Plaintiff as a member of the Defendant law firm; that in all other respects Plaintiff would be treated without regard to his or others' gender, race or age relative to compensation, benefits and all other terms and conditions of employment, including but not limited to, billing and supervisory credit for clients and client matters procured by Plaintiff as a member of the Defendant law firm; and that Plaintiff's annual compensation would be the greater of 60% of amounts annually billed by Defendant for professional services provided by Plaintiff or a reasonable, equitably fair higher percentage of annual revenue realized by Defendant due to Plaintiff's productivity and from client payment of fees charged by Defendant for professional services provided by Plaintiff and/or for which Plaintiff was entitled to billing and/or supervisory credit, which Defendant was able to set and collect at substantially higher hourly rates than that charged for most other similarly situated Detroit and other partners of Defendant because of Plaintiff's expertise and experience and relationships he maintained with clients that he procured.

50. In February, 2001, Defendant was required to sign a written employment contract that Defendant's representative stated was intended to incorporate and would be interpreted by Defendant consistent with the promises made to Plaintiff by Defendant's representative. Although the provisions of the contract expressly incorporated only some of the terms upon which Plaintiff and Defendant agreed, Defendant signed the contract in February, 2001, in

17

reliance upon Defendant's representations because he was required to do so to retain employment and because he had no choice under the circumstances if he was to be able to support his family.  Defendant's Management Committee representatives also signed it in February, 2001.

51.     Defendant also did not honor the promises made by its representative to Plaintiff between October and December, 2000, and Defendant demonstrated that the promises made to Plaintiff were false when they were made and that Defendant made them in bad faith with no intention of honoring them when it thereafter commenced a pattern and practice of discriminatory and other adverse employment actions against Plaintiff in breach promises made by Defendant to Plaintiff and in violation of his civil and other rights protected by federal and Michigan statutes and common law, which is continuing through the present.

52.     In 2001, in addition to other client and client matters procured by Plaintiff before and since then, Plaintiff procured one of the country's biggest retailers as a client and was retained by the client to represent it as lead counsel for at least 2 different class action employment litigation lawsuits filed against it in Florida and Wisconsin, to collaborate with other counsel retained by the client to represent it in defense of similar lawsuits filed in other states around the country, and to serve as the clients national coordinating counsel for expert issues posed by pending litigation against it around the country.

53.     Defendant has received millions of dollars in professional fees from the retail client due to Plaintiff's procurement of the client and for legal services provided by Plaintiff and other employees of Defendant to the client since 2001.

54.     Among other clients, Plaintiff also procured another of country's biggest retailers and the country's largest waste-to-energy company as clients since October, 2000.

18

55.    Defendant has received millions of dollars in professional fees from these and other clients due to Plaintiff's procurement of the clients and for legal services provided by Plaintiff and other employees of Defendant to the clients since 2001.

56.    Beginning in 2001, Defendant and certain partners of Defendant with Defendant's knowledge and approval actively interfered with or destroyed the retail client relationships that Plaintiff had procured without justification so that these other partners of Defendant could replace Plaintiff as billing, supervisory and/or relationship partner, which wrongfully enriched these and other partners of Defendant at plaintiff's expense; Defendant's management wrongfully held Plaintiff accountable and penalized him for certain errors and omissions of other partners of Defendant without the advance knowledge of Plaintiff and without giving him the opportunity to respond; Defendant's management failed to hold the responsible partners accountable for the errors and omissions committed by them; Defendant's Management Committee, CEO and/or COO unilaterally reallocated or reassigned billing and supervisory credit earned by and due to Plaintiff for the retail clients and retail client matters procured by Plaintiff to other partners of Defendant at Plaintiff's expense; and, as a result, Defendant's Management Committee, CEO and/or COO wrongfully refused to tender monthly and annual compensation to Plaintiff in accordance with Defendant's promises to Plaintiff, but instead wrongfully distributed compensation earned by but not paid to Plaintiff to other Partners of Defendant at Plaintiff's expense, among other wrongful acts.

57.    In late March, 2002, Plaintiff was notified by the Detroit office manager of Defendant that Defendant was again unilaterally extending the period during which Plaintiff would be employed by Defendant as a *contract* partner for an additional year, i.e. this time until February 1, 2003, and that the terms of the contract Plaintiff was required to sign in February,

2001, including but not limited to, the promise pertaining to guaranteed, minimum monthly and annual compensation promises, would continue to apply for the next year.

58.     This occurred in breach of Defendant's promise to unconditionally appoint Plaintiff to full partnership status, effective February 1, 2002.

59.     According to the Detroit office manager, Defendant breached the promise to unconditionally appoint Plaintiff to full partnership status, effective February 1, 2002, because false and defamatory comments covertly made about Plaintiff by unnamed partners of Defendant to Defendant's Management Committee, including false accusations that Plaintiff was at fault for errors or omissions actually committed by other partners of Defendant, without Plaintiff's advance knowledge and without Plaintiff having the opportunity to respond were deemed by Defendant to constitute grounds to deny Plaintiff partner status.

60.     This occurred after Plaintiff had complained to members of Defendant's management and Management Committee, including the representative of Defendant who recruited Plaintiff, that Defendant breached promises that that he would receive full billing credit for all clients and client matters procured by him and full supervisory credit for all client matters for which he provided legal representation as a member of the Defendant law firm.

61.     This also occurred after Defendant and certain partners of Defendant with Defendant's knowledge and approval began to actively interfere with or attempt to destroy the retail client relationships that Plaintiff had procured without justification so that these other partners of Defendant could replace Plaintiff as billing, supervisory and/or relationship partner and be enriched at plaintiff's expense; Defendant's management wrongfully held Plaintiff accountable and penalized him for certain errors and omissions of other partners of Defendant without the advance knowledge of Plaintiff and without giving him the opportunity to respond;

Defendant's management failed to hold the responsible partners accountable for the errors and omissions committed by them; Defendant's Management Committee, CEO and/or COO unilaterally reallocated or reassigned billing and supervisory credit earned by and due to Plaintiff for the retail clients and retail client matters procured by Plaintiff to other partners of Defendant at Plaintiff's expense; and, as a result, Defendant's Management Committee, CEO and/or COO began a pattern and practice of wrongfully refusing to tender monthly and annual compensation due to Plaintiff in accordance with Defendant's promises to Plaintiff, but instead wrongfully distributed compensation earned by but not paid to Plaintiff to other Partners of Defendant at Plaintiff's expense, among other wrongful acts.

62.     In late February or early March, 2003, Defendant paid Plaintiff $40,000 less in annual compensation for its 2003 fiscal year than that guaranteed to Plaintiff by Defendant's representative and Plaintiff was notified of and later received less in monthly draw for fiscal year 2004 than that guaranteed to him by Defendant's representative in breach of Defendant's employment contract with Plaintiff.

63.     This occurred after Plaintiff continued to complain to members of Defendant's management and Management Committee, including the representative of Defendant who recruited Plaintiff, that Defendant breached promises that that he would receive full billing credit for all clients and client matters procured by him and full supervisory credit for all client matters for which he provided legal representation as a member of the Defendant law firm.

64.     This also occurred after Defendant and certain partners of Defendant with Defendant's knowledge and approval continued to actively interfere with or attempt to destroy the retail client relationships that Plaintiff had procured without justification so that these other partners of Defendant could replace Plaintiff as billing, supervisory and/or relationship partner

and be enriched at plaintiff's expense; Defendant's management continued to wrongfully hold Plaintiff accountable and penalized him for certain errors and omissions of other partners of Defendant without the advance knowledge of Plaintiff and without giving him the opportunity to respond; Defendant's management still did not hold the responsible partners accountable for the errors and omissions committed by them; Defendant's Management Committee, CEO and/or COO continued to unilaterally reallocate or reassign billing and supervisory credit earned by and due to Plaintiff for the retail clients and retail client matters procured by Plaintiff to other partners of Defendant at Plaintiff's expense; and, as a result, Defendant's Management Committee, CEO and/or COO continued the pattern and practice of wrongfully refusing to tender monthly and annual compensation due to Plaintiff in accordance with Defendant's promises to Plaintiff, but instead wrongfully distributed compensation earned by but not paid to Plaintiff to other Partners of Defendant at Plaintiff's expense, among other wrongful acts.

65. Ironically, Plaintiff also was notified contemporaneous with these wrongful acts that Defendant had finally appointed him to full partner status.

66. As of this time, Defendant still had not provided Plaintiff with the Partnership Agreement and other documents previously requested by Plaintiff.

67. Despite this, a representative of Defendant sent only signature pages from the Partnership Agreement to Plaintiff for him to sign. Plaintiff declined to do so because Defendant had failed to satisfactorily address his complaints about Defendant's breach of promises that that he would receive full billing credit for all clients and client matters procured by him and full supervisory credit for all client matters for which he provided legal representation as a member of the Defendant law firm, because of the other behavior exhibited by Defendant or partners of Defendant with Defendant's knowledge and approval, and because Defendant still had not

22

provided Plaintiff with the Partnership Agreement and other documents previously requested by Plaintiff.

68.     Defendant did not address Plaintiff's complaints or resolve these to Plaintiff's satisfaction and did not provide the documents requested by Plaintiff at any time between March, 2003, and mid February, 2004.

69.     In mid February, 2004, Defendant's COO demanded in various communications directed to Plaintiff and while Plaintiff was on vacation in Florida with his family that Plaintiff execute the signature pages of the Partnership Agreement and threatened Plaintiff with disciplinary action, which Plaintiff understood to mean termination of employment, should he fail or refuse to do so.

70.     Plaintiff had no choice but to sign the signature pages of the Partnership Agreement on February 19, 2004, and to fax and mail these to Defendant's COO in response to his demand and threat because he needed to support his family and had no other employment opportunities at the time.  Defendant's representatives thereafter executed the signature pages and Defendant forwarded executed copies of these to Plaintiff in April, 2004, but without attachment to the Partnership Agreement.

71.     Defendant required that Plaintiff sign the signature pages although Defendant refused to address or resolve to Plaintiff's satisfaction Plaintiff's complaints about Defendant's breach of promises that that he would receive full billing credit for all clients and client matters procured by him and full supervisory credit for all client matters for which he provided legal representation as a member of the Defendant law firm;  although Defendant refused to address Plaintiff's complaints that Defendant and certain partners of Defendant with Defendant's knowledge and approval continued to actively interfere with or attempt to destroy the retail client

relationships that Plaintiff had procured without justification so that these other partners of Defendant could replace Plaintiff as billing, supervisory and/or relationship partner and be enriched at plaintiff's expense; although Defendant refused to address Plaintiff's complaints that Defendant's management continued to wrongfully hold Plaintiff accountable and penalize him for certain errors and omissions of other partners of Defendant without the advance knowledge of Plaintiff and without giving him the opportunity to respond; although Defendant's management still did not hold the responsible partners accountable for the errors and omissions committed by them; and although Defendant still had not provided Plaintiff with the Partnership Agreement and other documents previously requested by Plaintiff.

72.     A Detroit office partner later allowed Plaintiff to review and make a copy of the Partnership Agreement.

73.     Had Plaintiff been privy to the terms and provisions contained in the agreement contemporaneous with Defendant's solicitation of Plaintiff in the summer and fall of 2000, Plaintiff would have irrevocably terminated all discussions with Defendant about, and would have unconditionally rejected, the offers of employment extended by Defendant.

74.     Since at least October, 2000, and continuing through the present, Defendant demonstrated that the promises made to Plaintiff were false when they were made and that Defendant made them in bad faith with no intention of honoring them and Defendant otherwise has breached promises that Plaintiff would at all times be treated as a full partner of Defendant; that Plaintiff would not be paid less than guaranteed, minimum monthly and annual compensation to which Plaintiff and Defendant had mutually agreed; that Plaintiff's monthly and annual compensation would be based upon and would annually increase based on Plaintiff's productivity; that Plaintiff's productivity would be measured by hours recorded by Plaintiff and

billed by Defendant to clients for professional services provided by Plaintiff to the clients as a member of Defendant firm and annual revenue realized by Defendant from client payment of fees charged by Defendant for professional services provided by Plaintiff and/or for which Plaintiff was entitled to billing and/or supervisory credit; that Plaintiff would receive full billing credit for all clients and client matters procured by him and full supervisory credit for all client matters for which he provided legal representation whether or not he procured the client or client matter; that neither Defendant nor partners of Defendant would interfere with then extant and prospective client relationships procured by Plaintiff; that in all other respects Plaintiff would be treated the same as other founding partners of the Detroit office and other partners of Defendant relative to compensation, benefits and all other terms and conditions of employment, including but not limited to, billing and supervisory credit for clients and client matters procured by Plaintiff as a member of the Defendant law firm; that in all other respects Plaintiff would be treated without regard to his or others' gender, race or age relative to compensation, benefits and all other terms and conditions of employment, including but not limited to, billing and supervisory credit for clients and client matters procured by Plaintiff as a member of the Defendant law firm; and that Plaintiff's annual compensation would be the greater of 60% of amounts annually billed by Defendant for professional services provided by Plaintiff or a reasonable, equitably fair higher percentage of annual revenue realized by Defendant due to Plaintiff's productivity and from client payment of fees charged by Defendant for professional services provided by Plaintiff and/or for which Plaintiff was entitled to billing and/or supervisory credit, which Defendant was able to set and collect at substantially higher hourly rates than that charged for most other similarly situated Detroit and other partners of Defendant because of Plaintiff's expertise and experience and relationships he maintained with clients that he procured.

75.     Since October, 2001, and continuing though the present, Plaintiff has been the victim of a continuing pattern of discrimination on account of gender, race and age with respect to compensation and benefits as well as other terms and conditions of employment.

76.     This has occurred because Plaintiff continued to complain to members of Defendant's management and Management Committee, including the representative of Defendant who recruited Plaintiff, that Defendant breached promises that that he would receive full billing credit for all clients and client matters procured by him and full supervisory credit for all client matters for which he provided legal representation as a member of the Defendant law firm.

77.     This has occurred because Plaintiff continued to complain that Defendant and certain partners of Defendant with Defendant's knowledge and approval wrongfully interfered with and destroyed the retail client relationships that Plaintiff had procured without justification so that these other partners of Defendant could replace Plaintiff as billing, supervisory and/or relationship partner and be enriched at plaintiff's expense; that Defendant's management continued to wrongfully hold Plaintiff accountable and penalized him for certain errors and omissions of other partners of Defendant without the advance knowledge of Plaintiff and without giving him the opportunity to respond; that Defendant's management still did not hold the responsible partners accountable for the errors and omissions committed by them; that Defendant's Management Committee, CEO and/or COO continued to unilaterally and wrongfully reallocate or reassign billing and supervisory credit earned by and due to Plaintiff for the retail clients and retail client matters procured by Plaintiff to other partners of Defendant at Plaintiff's expense; and that, as a result, Defendant's Management Committee, CEO and/or COO continued the pattern and practice of wrongfully refusing to tender monthly and annual

compensation due to Plaintiff in accordance with Defendant's promises to Plaintiff, but instead wrongfully distributed compensation earned by but not paid to Plaintiff to other Partners of Defendant at Plaintiff's expense, among other wrongful acts.

78.     On March 4, 2011, Plaintiff received his annual compensation for Defendant's 2011 fiscal year and notified of his monthly draw for Defendant's 2012 fiscal year.

79.     The annual compensation paid by Defendant to Plaintiff for fiscal year 2011 was, and the monthly amount that Plaintiff will receive as a draw throughout fiscal year 2012 will be less than that earned by Plaintiff and was tendered in breach of Defendant's promises that Plaintiff would at all times be treated as a full partner of Defendant; that Plaintiff's monthly and annual compensation would be based upon and would annually increase based on Plaintiff's productivity; that Plaintiff's productivity would be measured by hours recorded by Plaintiff and billed by Defendant to clients for professional services provided by Plaintiff to the clients as a member of Defendant firm and annual revenue realized by Defendant from client payment of fees charged by Defendant for professional services provided by Plaintiff and/or for which Plaintiff was entitled to billing and/or supervisory credit; that Plaintiff would receive full billing credit for all clients and client matters procured by him and full supervisory credit for all client matters for which he provided legal representation whether or not he procured the client or client matter; that neither Defendant nor partners of Defendant would interfere with then extant and prospective client relationships procured by Plaintiff; that in all other respects Plaintiff would be treated the same as other founding partners of the Detroit office and other partners of Defendant relative to compensation, benefits and all other terms and conditions of employment, including but not limited to, billing and supervisory credit for clients and client matters procured by Plaintiff as a member of the Defendant law firm;  that in all other respects Plaintiff would be

treated without regard to his or others' gender, race or age relative to compensation, benefits and all other terms and conditions of employment, including but not limited to, billing and supervisory credit for clients and client matters procured by Plaintiff as a member of the Defendant law firm; and that Plaintiff's annual compensation would be the greater of 60% of amounts annually billed by Defendant for professional services provided by Plaintiff or a reasonable, equitably fair higher percentage of annual revenue realized by Defendant due to Plaintiff's productivity and from client payment of fees charged by Defendant for professional services provided by Plaintiff and/or for which Plaintiff was entitled to billing and/or supervisory credit, which Defendant was able to set and collect at substantially higher hourly rates than that charged for most other similarly situated Detroit and other partners of Defendant because of Plaintiff's expertise and experience and relationships he maintained with clients that he procured.

80.     The rate at which Plaintiff was compensated for fiscal 2011 was among the lowest applicable to partners in at least Defendant's Detroit office and was at a lower rate than that applicable to similarly situated female, non Caucasian and younger partners of Defendant who were no more than equally but actually less qualified that Plaintiff whether employed in Defendant's Detroit or other offices around the country in breach of promises made to Plaintiff by Defendant's representative and in breach of Defendant's Partnership Agreement, attached as Exhibit A, although his personal production, including but not limited to, billable and billed hours, billing and supervisory credit to which he was due, realization and billing rates, and revenue generation, exceeded or was at least equal to their personal productivity.

81.     Plaintiff was compensated for Defendant's fiscal year 2011 at a rate that was among the lowest for partners in at least Defendant's Detroit office and at a lower rate than that applicable to similarly situated female, non Caucasian and younger partners of Defendant for

work the performance of which required equal if not greater skill, effort and responsibility than that expended by higher compensated female, non Caucasian and younger partners who provided legal services under similar working conditions.

82.   The manner in which Defendant compensated Plaintiff for fiscal year 2011 perpetuated Defendant's discriminatory, subjectively determined and arbitrary and capricious compensation practices which have adversely affected Plaintiff since October, 2000, occurred in breach of promises made to Plaintiff when he was recruited by Defendant and the Partnership Agreement which Plaintiff was forced to sign in February, 2004, including the covenant of fair dealing implicit in such agreement, and occurred although Defendant knew or should have known that its conduct violated the EPA, other federal and state laws, including the Elliot Larsen Civil Rights Act.

83.   On March 5, 2010, Plaintiff received his annual compensation for Defendant's 2010 fiscal year and notified of his monthly draw for Defendant's 2011 fiscal year.

84.   The annual compensation paid by Defendant to Plaintiff for fiscal year 2010 and monthly amount that Plaintiff received as a draw throughout each fiscal year 2011 was less than that earned by Plaintiff and was tendered in breach of Defendant's promises that Plaintiff would at all times be treated as a full partner of Defendant; that Plaintiff's monthly and annual compensation would be based upon and would annually increase based on Plaintiff's productivity; that Plaintiff's productivity would be measured by hours recorded by Plaintiff and billed by Defendant to clients for professional services provided by Plaintiff to the clients as a member of Defendant firm and annual revenue realized by Defendant from client payment of fees charged by Defendant for professional services provided by Plaintiff and/or for which Plaintiff was entitled to billing and/or supervisory credit; that Plaintiff would receive full billing

29

credit for all clients and client matters procured by him and full supervisory credit for all client matters for which he provided legal representation whether or not he procured the client or client matter; that neither Defendant nor partners of Defendant would interfere with then extant and prospective client relationships procured by Plaintiff; that in all other respects Plaintiff would be treated the same as other founding partners of the Detroit office and other partners of Defendant relative to compensation, benefits and all other terms and conditions of employment, including but not limited to, billing and supervisory credit for clients and client matters procured by Plaintiff as a member of the Defendant law firm;  that in all other respects Plaintiff would be treated without regard to his or others' gender, race or age relative to compensation, benefits and all other terms and conditions of employment, including but not limited to, billing and supervisory credit for clients and client matters procured by Plaintiff as a member of the Defendant law firm; and that Plaintiff's annual compensation would be the greater of 60% of amounts annually billed by Defendant for professional services provided by Plaintiff or a reasonable, equitably fair higher percentage of annual revenue realized by Defendant due to Plaintiff's productivity and from client payment of fees charged by Defendant for professional services provided by Plaintiff and/or for which Plaintiff was entitled to billing and/or supervisory credit, which Defendant was able to set and collect at substantially higher hourly rates than that charged for most other similarly situated Detroit and other partners of Defendant because of Plaintiff's expertise and experience and relationships he maintained with clients that he procured.

85.    Plaintiff was compensated for fiscal year 2010 at the lowest rate among all partners of Defendant's Detroit office and at a lower rate than similarly situated female, non Caucasian and younger partners of Defendant who were no more than equally but actually less qualified that Plaintiff whether employed in Defendant's Detroit or other offices around the

30

country in breach of promises made to Plaintiff by Defendant's representative and in breach of Defendant's Partnership Agreement, attached as Exhibit A, although his personal production, including but not limited to, billable and billed hours, billing and supervisory credit to which he was due, realization and billing rates, and revenue generation, exceeded or was at least equal to their personal productively.

86.     Plaintiff was compensated for Defendant's fiscal year 2010 at the lowest rate applicable to partners in at least Defendant's Detroit office and at a lower rate than that applicable to similarly situated female, non Caucasian and younger partners of Defendant for work the performance of which required equal if not greater skill, effort and responsibility than that expended by higher compensated female, non Caucasian and younger partners who provided legal services under similar working conditions.

87.     The manner in which Defendant compensated Plaintiff for fiscal year 2010 perpetuated Defendant's discriminatory, subjectively determined and arbitrary and capricious compensation practices which have adversely affected Plaintiff since October, 2000, occurred in breach of promises made to Plaintiff when he was recruited by Defendant and the Partnership Agreement which Plaintiff was forced to sign in February, 2004, including the covenant of fair dealing implicit in such agreement, and occurred although Defendant knew or should have known that its conduct violated the EPA, other federal and state laws, including the Elliot Larsen Civil Rights Act.

88.     On or about February 28, 2009, Plaintiff received his annual compensation for Defendant's 2009 fiscal year and notified of his monthly draw for Defendant's 2010 fiscal year.

89.     The annual compensation paid by Defendant to Plaintiff for fiscal year 2009 and monthly amount that Plaintiff received as a draw throughout fiscal year 2010 was less than that

earned by Plaintiff and was tendered in breach of Defendant's promises that Plaintiff would at all times be treated as a full partner of Defendant; that Plaintiff's monthly and annual compensation would be based upon and would annually increase based on Plaintiff's productivity; that Plaintiff's productivity would be measured by hours recorded by Plaintiff and billed by Defendant to clients for professional services provided by Plaintiff to the clients as a member of Defendant firm and annual revenue realized by Defendant from client payment of fees charged by Defendant for professional services provided by Plaintiff and/or for which Plaintiff was entitled to billing and/or supervisory credit; that Plaintiff would receive full billing credit for all clients and client matters procured by him and full supervisory credit for all client matters for which he provided legal representation whether or not he procured the client or client matter; that neither Defendant nor partners of Defendant would interfere with then extant and prospective client relationships procured by Plaintiff; that in all other respects Plaintiff would be treated the same as other founding partners of the Detroit office and other partners of Defendant relative to compensation, benefits and all other terms and conditions of employment, including but not limited to, billing and supervisory credit for clients and client matters procured by Plaintiff as a member of the Defendant law firm;  that in all other respects Plaintiff would be treated without regard to his or others' gender, race or age relative to compensation, benefits and all other terms and conditions of employment, including but not limited to, billing and supervisory credit for clients and client matters procured by Plaintiff as a member of the Defendant law firm; and that Plaintiff's annual compensation would be the greater of 60% of amounts annually billed by Defendant for professional services provided by Plaintiff or a reasonable, equitably fair higher percentage of annual revenue realized by Defendant due to Plaintiff's productivity and from client payment of fees charged by Defendant for professional services provided by Plaintiff

32

and/or for which Plaintiff was entitled to billing and/or supervisory credit, which Defendant was able to set and collect at substantially higher hourly rates than that charged for most other similarly situated Detroit and other partners of Defendant because of Plaintiff's expertise and experience and relationships he maintained with clients that he procured.

90.     The rate at which Plaintiff was compensated for fiscal year 2009 was among the lowest applicable to partners in at least Defendant's Detroit office and was at a lower rate than that applicable to similarly situated female, non Caucasian and younger partners of Defendant who were no more than equally but actually less qualified that Plaintiff whether employed in Defendant's Detroit or other offices around the country in breach of promises made to Plaintiff by Defendant's representative and in breach of Defendant's Partnership Agreement, attached as Exhibit A, although his personal production, including but not limited to, billing and supervisory credit to which he was due, realization and billing rates, and revenue generation, exceeded or was at least equal to their personal productively.

91.     Plaintiff was compensated for Defendant's fiscal year 2009 at a rate that was among the lowest for partners in at least Defendant's Detroit office and at a lower rate than that applicable to similarly situated female, non Caucasian and younger partners of Defendant for work the performance of which required equal if not greater skill, effort and responsibility than that expended by higher compensated female, non Caucasian and younger partners who provided legal services under similar working conditions.

92.     The manner in which Defendant compensated Plaintiff for fiscal year 2009 perpetuated Defendant's discriminatory, subjectively determined and arbitrary and capricious compensation practices which have adversely affected Plaintiff since October, 2000, occurred in breach of promises made to Plaintiff when he was recruited by Defendant and the Partnership

Agreement which Plaintiff was forced to sign in February, 2004, including the covenant of fair dealing implicit in such agreement, and occurred although Defendant knew or should have known that its conduct violated the EPA, other federal and state laws, including the Elliot Larsen Civil Rights Act.

93.     On February 29, 2008, Plaintiff received his annual compensation for Defendant's 2008 fiscal year and notified of his monthly draw for Defendant's 2009 fiscal year.

94.     The annual compensation paid by Defendant to Plaintiff for fiscal year 2008 and monthly amount that Plaintiff received as a draw throughout fiscal year 2009 was less than that earned by Plaintiff and was tendered in breach of Defendant's promises that Plaintiff would at all times be treated as a full partner of Defendant; that Plaintiff's monthly and annual compensation would be based upon and would annually increase based on Plaintiff's productivity; that Plaintiff's productivity would be measured by hours recorded by Plaintiff and billed by Defendant to clients for professional services provided by Plaintiff to the clients as a member of Defendant firm and annual revenue realized by Defendant from client payment of fees charged by Defendant for professional services provided by Plaintiff and/or for which Plaintiff was entitled to billing and/or supervisory credit; that Plaintiff would receive full billing credit for all clients and client matters procured by him and full supervisory credit for all client matters for which he provided legal representation whether or not he procured the client or client matter; that neither Defendant nor partners of Defendant would interfere with then extant and prospective client relationships procured by Plaintiff; that in all other respects Plaintiff would be treated the same as other founding partners of the Detroit office and other partners of Defendant relative to compensation, benefits and all other terms and conditions of employment, including but not limited to, billing and supervisory credit for clients and client matters procured by Plaintiff as a

member of the Defendant law firm; that in all other respects Plaintiff would be treated without regard to his or others' gender, race or age relative to compensation, benefits and all other terms and conditions of employment, including but not limited to, billing and supervisory credit for clients and client matters procured by Plaintiff as a member of the Defendant law firm; and that Plaintiff's annual compensation would be the greater of 60% of amounts annually billed by Defendant for professional services provided by Plaintiff or a reasonable, equitably fair higher percentage  of annual revenue realized by Defendant due to Plaintiff's productivity and from client payment of fees charged by Defendant for professional services provided by Plaintiff and/or for which Plaintiff was entitled to billing and/or supervisory credit, which Defendant was able to set and collect at substantially higher hourly rates than that charged for most other similarly situated Detroit and other partners of Defendant because of Plaintiff's expertise and experience and relationships he maintained with clients that he procured.

95.     The rate at which Plaintiff was compensated for fiscal year 2008 was among the lowest applicable to partners in at least Defendant's Detroit office and was at a lower rate than that applicable to similarly situated female, non Caucasian and younger partners of Defendant who were no more than equally but actually less qualified that Plaintiff whether employed in Defendant's Detroit or other offices around the country in breach of promises made to Plaintiff by Defendant's representative and in breach of Defendant's Partnership Agreement, attached as Exhibit A, although his personal production, including but not limited to, billing and supervisory credit to which he was due, realization and billing rates, and revenue generation, exceeded or was at least equal to their personal productively.

96.     Plaintiff was compensated for Defendant's fiscal year 2008 at a rate that was among the lowest applicable to partners in at least Defendant's Detroit office and at a lower rate

than that applicable to similarly situated female, non Caucasian and younger partners of Defendant for work the performance of which required equal if not greater skill, effort and responsibility than that expended by higher compensated female, non Caucasian and younger partners who provided legal services under similar working conditions.

97.     The manner in which Defendant compensated Plaintiff for fiscal year 2008 perpetuated Defendant's discriminatory, subjectively determined and arbitrary and capricious compensation practices which have adversely affected Plaintiff since October, 2000, occurred in breach of promises made to Plaintiff when he was recruited by Defendant and the Partnership Agreement which Plaintiff was forced to sign in February, 2004, including the covenant of fair dealing implicit in such agreement, and occurred although Defendant knew or should have known that its conduct violated the EPA, other federal and state laws, including the Elliot Larsen Civil Rights Act.

98.     On February 28, 2007, Plaintiff received his annual compensation for Defendant's 2007 fiscal year and notified of his monthly draw for Defendant's 2008 fiscal year.

99.     The annual compensation paid by Defendant to Plaintiff for fiscal year 2007 and monthly amount that Plaintiff received as a draw throughout fiscal year 2008 was less than that earned by Plaintiff and was tendered in breach of Defendant's promises that Plaintiff would at all times be treated as a full partner of Defendant; that Plaintiff's monthly and annual compensation would be based upon and would annually increase based on Plaintiff's productivity; that Plaintiff's productivity would be measured by hours recorded by Plaintiff and billed by Defendant to clients for professional services provided by Plaintiff to the clients as a member of Defendant firm and annual revenue realized by Defendant from client payment of fees charged by Defendant for professional services provided by Plaintiff and/or for which Plaintiff was

36

entitled to billing and/or supervisory credit; that Plaintiff would receive full billing credit for all clients and client matters procured by him and full supervisory credit for all client matters for which he provided legal representation whether or not he procured the client or client matter; that neither Defendant nor partners of Defendant would interfere with then extant and prospective client relationships procured by Plaintiff; that in all other respects Plaintiff would be treated the same as other founding partners of the Detroit office and other partners of Defendant relative to compensation, benefits and all other terms and conditions of employment, including but not limited to, billing and supervisory credit for clients and client matters procured by Plaintiff as a member of the Defendant law firm;  that in all other respects Plaintiff would be treated without regard to his or others' gender, race or age relative to compensation, benefits and all other terms and conditions of employment, including but not limited to, billing and supervisory credit for clients and client matters procured by Plaintiff as a member of the Defendant law firm; and that Plaintiff's annual compensation would be the greater of 60% of amounts annually billed by Defendant for professional services provided by Plaintiff or a reasonable, equitably fair higher percentage  of annual revenue realized by Defendant due to Plaintiff's productivity and from client payment of fees charged by Defendant for professional services provided by Plaintiff and/or for which Plaintiff was entitled to billing and/or supervisory credit, which Defendant was able to set and collect at substantially higher hourly rates than that charged for most other similarly situated Detroit and other partners of Defendant because of Plaintiff's expertise and experience and relationships he maintained with clients that he procured.

100.   Plaintiff also was compensated at a rate that was among the lowest applicable to partners in at least Defendant's Detroit office and at a rate lower than that applicable to similarly situated female, non Caucasian and younger partners of Defendant who were no more than

equally but actually less qualified that Plaintiff whether employed in Defendant's Detroit or other offices around the country in breach of promises made to Plaintiff by Defendant's representative and in breach of Defendant's Partnership Agreement, attached as Exhibit A, although his personal production, including but not limited to, billing and supervisory credit to which he was due, realization and billing rates, and revenue generation, exceeded or was at least equal to their personal productively.

101.    Plaintiff was compensated for Defendant's fiscal year 2007 at a rate that was among the lowest applicable to partners in at least Defendant's Detroit office and at a lower rate than that applicable to similarly situated female, non Caucasian and younger partners of Defendant for work the performance of which required equal if not greater skill, effort and responsibility than that expended by higher compensated female, non Caucasian and younger partners who provided legal services under similar working conditions.

102.    The manner in which Defendant compensated Plaintiff for fiscal year 2007 perpetuated Defendant's discriminatory, subjectively determined and arbitrary and capricious compensation practices which have adversely affected Plaintiff since October, 2000, occurred in breach of promises made to Plaintiff when he was recruited by Defendant and the Partnership Agreement which Plaintiff was forced to sign in February, 2004, including the covenant of fair dealing implicit in such agreement, and occurred although Defendant knew or should have known that its conduct violated the EPA, other federal and state laws, including the Elliot Larsen Civil Rights Act.

103.    On February 27, 2006, Plaintiff received his annual compensation for Defendant's 2006 fiscal year and notified of his monthly draw for Defendant's 2007 fiscal year.

104.    The annual compensation paid by Defendant to Plaintiff for fiscal year 2006 and monthly amount that Plaintiff received as a draw throughout fiscal year 2007 was less than that earned by Plaintiff and was tendered in breach of Defendant's promises that Plaintiff would at all times be treated as a full partner of Defendant; that Plaintiff's monthly and annual compensation would be based upon and would annually increase based on Plaintiff's productivity; that Plaintiff's productivity would be measured by hours recorded by Plaintiff and billed by Defendant to clients for professional services provided by Plaintiff to the clients as a member of Defendant firm and annual revenue realized by Defendant from client payment of fees charged by Defendant for professional services provided by Plaintiff and/or for which Plaintiff was entitled to billing and/or supervisory credit; that Plaintiff would receive full billing credit for all clients and client matters procured by him and full supervisory credit for all client matters for which he provided legal representation whether or not he procured the client or client matter; that neither Defendant nor partners of Defendant would interfere with then extant and prospective client relationships procured by Plaintiff; that in all other respects Plaintiff would be treated the same as other founding partners of the Detroit office and other partners of Defendant relative to compensation, benefits and all other terms and conditions of employment, including but not limited to, billing and supervisory credit for clients and client matters procured by Plaintiff as a member of the Defendant law firm;  that in all other respects Plaintiff would be treated without regard to his or others' gender, race or age relative to compensation, benefits and all other terms and conditions of employment, including but not limited to, billing and supervisory credit for clients and client matters procured by Plaintiff as a member of the Defendant law firm; and that Plaintiff's annual compensation would be the greater of 60% of amounts annually billed by Defendant for professional services provided by Plaintiff or a reasonable, equitably fair higher

39

percentage  of annual revenue realized by Defendant due to Plaintiff's productivity and from client payment of fees charged by Defendant for professional services provided by Plaintiff and/or for which Plaintiff was entitled to billing and/or supervisory credit, which Defendant was able to set and collect at substantially higher hourly rates than that charged for most other similarly situated Detroit and other partners of Defendant because of Plaintiff's expertise and experience and relationships he maintained with clients that he procured.

105.   Plaintiff also was compensated at a rate that was among the lowest applicable to partners in at least Defendant's Detroit office and at a rate lower than that applicable to similarly situated female, non Caucasian and younger partners of Defendant who were no more than equally but actually less qualified that Plaintiff whether employed in Defendant's Detroit or other offices around the country in breach of promises made to Plaintiff by Defendant's representative and in breach of Defendant's Partnership Agreement, attached as Exhibit A, although his personal production, including but not limited to, billing and supervisory credit to which he was due, realization and billing rates, and revenue generation, exceeded or was at least equal to their personal productively.

106.   Plaintiff was compensated for Defendant's fiscal year 2006 at a rate that was among the lowest applicable to partners in at least Defendant's Detroit office and at a lower rate than that applicable to similarly situated female, non Caucasian and younger partners of Defendant for work the performance of which required equal if not greater skill, effort and responsibility than that expended by higher compensated female, non Caucasian and younger partners who provided legal services under similar working conditions.

107.   The manner in which Defendant compensated Plaintiff for fiscal year 2006 perpetuated Defendant's discriminatory, subjectively determined and arbitrary and capricious

compensation practices which have adversely affected Plaintiff since October, 2000, occurred in breach of promises made to Plaintiff when he was recruited by Defendant and the Partnership Agreement which Plaintiff was forced to sign in February, 2004, including the covenant of fair dealing implicit in such agreement, and occurred although Defendant knew or should have known that its conduct violated the EPA, other federal and state laws, including the Elliot Larsen Civil Rights Act.

108.    On or about February 28, 2005, Plaintiff received his annual compensation for Defendant's 2005 fiscal year and notified of his monthly draw for Defendant's 2006 fiscal year.

109.    The annual compensation paid by Defendant to Plaintiff for fiscal year 2005 and monthly amount that Plaintiff received as a draw throughout fiscal year 2006 was less than that earned by Plaintiff and was tendered in breach of Defendant's promises that Plaintiff would at all times be treated as a full partner of Defendant; that Plaintiff would not be paid less than guaranteed, minimum monthly and annual compensation to which Plaintiff and Defendant had mutually agreed; that Plaintiff's monthly and annual compensation would be based upon and would annually increase based on Plaintiff's productivity; that Plaintiff's productivity would be measured by hours recorded by Plaintiff and billed by Defendant to clients for professional services provided by Plaintiff to the clients as a member of Defendant firm and annual revenue realized by Defendant from client payment of fees charged by Defendant for professional services provided by Plaintiff and/or for which Plaintiff was entitled to billing and/or supervisory credit; that Plaintiff would receive full billing credit for all clients and client matters procured by him and full supervisory credit for all client matters for which he provided legal representation whether or not he procured the client or client matter; that neither Defendant nor partners of Defendant would interfere with then extant and prospective client relationships procured by

Plaintiff; that in all other respects Plaintiff would be treated the same as other founding partners of the Detroit office and other partners of Defendant relative to compensation, benefits and all other terms and conditions of employment, including but not limited to, billing and supervisory credit for clients and client matters procured by Plaintiff as a member of the Defendant law firm; that in all other respects Plaintiff would be treated without regard to his or others' gender, race or age relative to compensation, benefits and all other terms and conditions of employment, including but not limited to, billing and supervisory credit for clients and client matters procured by Plaintiff as a member of the Defendant law firm; and that Plaintiff's annual compensation would be the greater of 60% of amounts annually billed by Defendant for professional services provided by Plaintiff or a reasonable, equitably fair higher percentage of annual revenue realized by Defendant due to Plaintiff's productivity and from client payment of fees charged by Defendant for professional services provided by Plaintiff and/or for which Plaintiff was entitled to billing and/or supervisory credit, which Defendant was able to set and collect at substantially higher hourly rates than that charged for most other similarly situated Detroit and other partners of Defendant because of Plaintiff's expertise and experience and relationships he maintained with clients that he procured.

110.   Plaintiff also was compensated at a rate that was among the lowest applicable to partners in at least Defendant's Detroit office and at a rate lower than that applicable to similarly situated female, non Caucasian and younger partners of Defendant who were no more than equally but actually less qualified that Plaintiff whether employed in Defendant's Detroit or other offices around the country in breach of promises made to Plaintiff by Defendant's representative and in breach of Defendant's Partnership Agreement, attached as Exhibit A, although his personal production, including but not limited to, billing and supervisory credit to

which he was due, realization and billing rates, and revenue generation, exceeded or was at least equal to their personal productively.

111.    Plaintiff was compensated for Defendant's fiscal year 2005 at a rate that was among the lowest applicable to partners in at least Defendant's Detroit office and at a lower rate than that applicable to similarly situated female, non Caucasian and younger partners of Defendant for work the performance of which required equal if not greater skill, effort and responsibility than that expended by higher compensated female, non Caucasian and younger partners who provided legal services under similar working conditions.

112.    The manner in which Defendant compensated Plaintiff for fiscal year 2005 perpetuated Defendant's discriminatory, subjectively determined and arbitrary and capricious compensation practices which have adversely affected Plaintiff since October, 2000, occurred in breach of promises made to Plaintiff when he was recruited by Defendant and the Partnership Agreement which Plaintiff was forced to sign in February, 2004, including the covenant of fair dealing implicit in such agreement, and occurred although Defendant knew or should have known that its conduct violated the EPA, other federal and state laws, including the Elliot Larsen Civil Rights Act.

113.    During the period between February 28, 2005, and the present, Defendant breached promises governing compensation due to Plaintiff for his efforts and discriminated against Plaintiff with respect to compensation tendered to him because Plaintiff continued to complain to members of Defendant's management and Management Committee, including the representative of Defendant who recruited Plaintiff, that Defendant breached promises that that he would receive full billing credit for all clients and client matters procured by him and full

43

supervisory credit for all client matters for which he provided legal representation as a member of the Defendant law firm.

114. During the period between February 28, 2005, and the present, Defendant breached promises governing compensation due to Plaintiff for his efforts and discriminated against Plaintiff with respect to compensation tendered to him because Plaintiff continued to complain that Defendant and certain partners of Defendant with Defendant's knowledge and approval wrongfully interfered with and destroyed the retail client relationships that Plaintiff had procured without justification so that these other partners of Defendant could replace Plaintiff as billing, supervisory and/or relationship partner and be enriched at plaintiff's expense; that Defendant's management continued to wrongfully hold Plaintiff accountable and penalized him for certain errors and omissions of other partners of Defendant without the advance knowledge of Plaintiff and without giving him the opportunity to respond; that Defendant's management still did not hold the responsible partners accountable for the errors and omissions committed by them; that Defendant's Management Committee, CEO and/or COO continued to unilaterally and wrongfully reallocate or reassign billing and supervisory credit earned by and due to Plaintiff for the retail clients and retail client matters procured by Plaintiff to other partners of Defendant at Plaintiff's expense; and that, as a result, Defendant's Management Committee, CEO and/or COO continued the pattern and practice of wrongfully refusing to tender monthly and annual compensation due to Plaintiff in accordance with Defendant's promises to Plaintiff, but instead wrongfully distributed compensation earned by but not paid to Plaintiff to other Partners of Defendant at Plaintiff's expense, among other wrongful acts.

**COUNT I**

**GENDER DISCRIMINATION**

Plaintiff realleges and incorporates by reference its allegations in paragraphs 1 through 114 as if hereinafter set forth paragraph by paragraph.

115.    Since October, 2000,  Plaintiff has been an employee of Defendant and Defendant was his employer within the meaning of these terms in and subject to Title VII of the Civil Rights Act of 1964, as amended, 42. U.S.C.§§2000e, *et seq.* ( "Title VII"), and the Civil Rights Act of 1991, 42 U.S.C. § 1981a ("CRA").

116.    Plaintiff  was compensated for fiscal years 2005 through 2011 at a lower rate than similarly situated female partners of Defendant for work the performance of which required equal if not greater skill, effort and responsibility than that expended by higher compensated female partners who provided legal services under similar working conditions.

117.    Plaintiff's gender or the gender of similarly situated higher compensated female partners was at least one factor that made a difference in these compensation decisions to Plaintiff's detriment.

118.    Had Plaintiff been a female, he would have been more highly compensated.

119.    Defendant through its Management committee and other agents treated Plaintiff differently than similarly situated female partners with respect to compensation during fiscal years 2005-2011 because of gender.

120.    The manner in which Defendant compensated Plaintiff for fiscal years 2005-2011 was intentional, perpetuated Defendant's discriminatory, subjectively determined and arbitrary and capricious compensation practices which have adversely affected Plaintiff since October,

2000, and occurred although Defendant knew or should have known that its conduct violated the Title VII and the CRA.

121. As a direct and proximate result of Defendant's acts, Plaintiff has endured financial distress, mental and emotional distress, embarrassment and humiliation and damage to his reputation among his peers.

122. As a direct and proximate result of Defendant's acts, Plaintiff has incurred economic damages in an amount in excess of $75,000.

## COUNT II

## RACE DISCRIMINATION

Plaintiff realleges and incorporates by reference its allegations in paragraphs 1 through 122 as if hereinafter set forth paragraph by paragraph.

123. Since October, 2000, Plaintiff has been an employee of Defendant and Defendant was his employer within the meaning of these terms in and subject to Title VII of the Civil Rights Act of 1964, as amended, 42. U.S.C.§§ 2000e, *et seq*. ( "Title VII"), and the Civil Rights Act of 1991, 42 U.S.C. § 1981a ("CRA").

124. Plaintiff was compensated for fiscal years 2005 through 2011 at a lower rate than similarly situated non Caucasian partners of Defendant for work the performance of which required equal if not greater skill, effort and responsibility than that expended by higher compensated non Caucasian partners of Defendant who provided legal services under similar working conditions.

125. Plaintiff's race or the race of similarly situated higher compensated non Caucasian partners was at least one factor that made a difference in these compensation decisions to Plaintiff's detriment.

46

126.    Had Plaintiff been other than Caucasian, he would have been more highly compensated.

127.    Defendant through its Management committee and other agents treated Plaintiff differently than similarly situated non Caucasian partners with respect to compensation during fiscal years 2005-2011 because of race.

128.    The manner in which Defendant compensated Plaintiff for fiscal years 2005-2011 was intentional, perpetuated Defendant's discriminatory, subjectively determined and arbitrary and capricious compensation practices which have adversely affected Plaintiff since October, 2000, and occurred although Defendant knew or should have known that its conduct violated the Title VII and the CRA.

129.    As a direct and proximate result of Defendant's acts, Plaintiff has endured financial distress, mental and emotional distress, embarrassment and humiliation and damage to his reputation among his peers.

130.    As a direct and proximate result of Defendant's acts, Plaintiff has incurred economic damages in an amount in excess of $75,000.

## COUNT III

## AGE DISCRIMINATION

Plaintiff realleges and incorporates by reference its allegations in paragraphs 1 through 130 as if hereinafter set forth paragraph by paragraph.

131.    Since October, 2000, Plaintiff has been an employee of Defendant and Defendant was his employer within the meaning of these terms in and subject to the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, *et seq*. ("ADEA").

132.   Plaintiff  was compensated for fiscal years 2005 through 2011 at a lower rate than similarly situated younger partners of Defendant for work the performance of which required equal if not greater skill, effort and responsibility than that expended by higher compensated younger partners who provided legal services under similar working conditions.

133.   Plaintiff's age or the age of similarly situated higher compensated younger partners was at least one factor that made a difference in these compensation decisions to Plaintiff's detriment.

134.   Had Plaintiff been younger, he would have been more highly compensated.

135.   Defendant through its Management committee and other agents treated Plaintiff differently than similarly situated younger partners with respect to compensation during fiscal years 2005-2011 because of age.

136.   The manner in which Defendant compensated Plaintiff for fiscal years 2005-2011 was intentional, perpetuated Defendant's discriminatory, subjectively determined and arbitrary and capricious compensation practices which have adversely affected Plaintiff since October, 2000, and occurred although Defendant knew or should have known that its conduct violated the ADEA and the CRA.

137.   As a direct and proximate result of Defendant's acts, Plaintiff has endured financial distress, mental and emotional distress, embarrassment and humiliation and damage to his reputation among his peers.

138.   As a direct and proximate result of Defendant's acts, Plaintiff has incurred economic damages in an amount in excess of $75,000.

## COUNT IV

## <u>VIOLATION OF THE EQUAL PAY ACT</u>

Plaintiff realleges and incorporates by reference its allegations in paragraphs 1 through 138 as if hereinafter set forth paragraph by paragraph.

139.   Since October, 2000,  Plaintiff has been an employee of Defendant and Defendant was his employer within the meaning of these terms in and subject to the Equal Pay Act.

140.   Plaintiff was compensated for fiscal years 2005 through 2011 at a lower rate than similarly situated female partners of Defendant for work the performance of which required equal if not greater skill, effort and responsibility than that expended by higher compensated female partners who provided legal services under similar working conditions.

141.   The manner in which Defendant compensated Plaintiff for fiscal years 2005-2011 perpetuated Defendant's discriminatory, subjectively determined and arbitrary and capricious compensation practices which have adversely affected Plaintiff since October, 2000, and willfully occurred although Defendant knew or should have known that its conduct violated the EPA and the CRA.

142.   As a direct and proximate result of Defendant's acts, Plaintiff has endured financial distress, mental and emotional distress, embarrassment and humiliation and damage to his reputation among his peers.

143.   As a direct and proximate result of Defendant's acts, Plaintiff has incurred economic damages in an amount in excess of $75,000 .

49

Wherefore, Plaintiff Raymond J. Carey respectfully requests that the court declare that Defendant's conduct violated Plaintiff's rights protected by the EPA, Title VII, the CRA and the ADEA and that it grant the following relief:

      A.     Economic damages in the form back pay due to Plaintiff for each of Defendant's fiscal years 2005 through and including 2011;

      B.     Economic damages to compensate for lost investment and retirement income caused by Defendants' wrongful acts for each of Defendant's fiscal years 2005 through and including 2011;

      C.     Liquidated damages for each of the Defendants fiscal years 2008-2011 for Defendant's bad faith and willful violations of the Equal Pay Act;

      D.     Compensatory damages for the financial distress, mental and emotional distress, embarrassment, and damage to reputation endured by Plaintiff during each year from 2005 through and including the present;

      E.     Exemplary and punitive damages specified in 42 U.S.C. § 1981a for each violation of Plaintiffs rights;

      G.     An injunction which prohibits Defendant from further breaches of Plaintiff's civil rights;

      H.     Litigation costs and reasonable attorneys provided by statute;

      I.     Prejudgment and judgment interest;

      J.     Such other relief that the Court deems equitable and appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury for purposes of this action.

Respectfully Submitted,

**GASIOREK, MORGAN, GRECO**
**& McCAULEY, P.C.**


s/Sam Morgan_____
 Sam Morgan (P-36694)
 Donald J. Gasiorek (P-24987)
Attorneys for Plaintiff
30500 Northwestern Highway, Suite 425
Farmington Hills, Michigan 48334
(T) (248) 865-0001 / (F) (248) 865-0002
smorgan@gmgmlaw.com
dgasiorek@gmgmlaw.com



s/Raymond J.Carey_____
**RAYMOND J. CAREY P33266**
460 Lakeland
Grosse Pointe, Mi 48230
e-mail: rjcarey@foley.com;
marcar54@comcast.net
Telephone:  313.580.1884

Dated:  June 22, 2011